IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FREEDOM HEALTHCARE PROPERTIES OF TEXAS, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:24-CV-00789-N |
| ADDICTION CAMPUSES OF TEXAS, LLC, | § § § | |
| Defendant. | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

This case involves a lease dispute between a landlord, Plaintiff Freedom Healthcare Properties of Texas, LLC ("FHP"), and its commercial tenant, Defendant Addiction Campuses of Texas, LLC ("ACT"). Based on the evidence at trial, the Court makes the following findings of fact and conclusions of law and determines that FHP has failed to meet its burden of proof to show it is entitled to a writ of possession.

### II. FINDINGS OF FACT

1.    Plaintiff FHP is a limited liability company with three members: (1) Brent Clements, an individual and citizen of Tennessee; (2) John Daily, an individual and citizen of Florida; and (3) Craig Macnab, an individual and citizen of Colorado.

2.    Defendant ACT is a limited liability company with one member: OMT Addiction Centers, LLC, a limited liability company. OMT Addiction Centers, LLC has three members, (1) SK Vertava LLC; (2) OMT Investor, LP, LLC; and (3) NuDawn

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 1

Recovery, LLC. SK Vertava LLC's members are all citizens of New York. OMT Investor, LP, LLC's members are citizens of New York, New Jersey, Israel, and Puerto Rico. NuDawn Recovery, LLC's members are citizens of New York, North Carolina, and Barbados.

### A.  The Lease

3.      FHP owns real property with the primary address of 6950 Shady Lane, Scurry, TX 75158 and related addresses of 7080 and 7026 Shady Lane, Scurry, TX 75158. Effective April 1, 2017, FHP and ACT entered into a Lease Agreement for the Property (the "Lease").

4.      The Parties subsequently amended the Lease on two occasions. First on March 16, 2018, and second by way of a Settlement Agreement on June 25, 2023.

5.      Section 3 of the Lease provides for a lease term of twenty years commencing on April 1, 2017, and ending on April 1, 2037.

6.      The leased property includes multiple buildings and outdoor spaces specifically designed to be used as an inpatient substance abuse treatment facility. The property can accommodate up to 180 patients.

7.      Section 4(a) of the Lease provides in pertinent part that the rent is "payable in monthly installments . . . in advance without notice . . . on the first day of each and every month," and that such "installments will be paid at Landlord's offices or such other address as Landlord may notify Tenant in writing."

8.      Section 4(b) of the Lease provides in pertinent part that "this Lease is an absolute triple net lease and that except as otherwise expressly set forth herein, Landlord

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 2

and tenant intend that the payments provided the Landlord under this lease shall provide a return to Landlord equal to annual Rent absolutely net of any and all costs and expenses relating to the Leased Property."

9.      Section 6(b) of the Lease provides that "Tenant will pay all operating expenses for the leased property whether such expenses are incurred by Tenant or Landlord."

10.     The Lease does not define the term "operating expenses."

11.     Section 7 of the Lease provides for ACT to pay taxes associated with the leased property. Section 7(a) of the Lease states as follows:

> Tenant shall pay, or cause to be paid, all real estate taxes and assessments, both general and special, which may be levied and assessed against the Landlord for the Leased Property . . . before any fine, penalty, interest or cost may be added for nonpayment. Subject to Section 9, Tenant shall make such payments directly to the taxing authorities where feasible, and promptly furnish to Landlord copies of official receipts or other satisfactory proof evidencing such payments, but in no event later than thirty (30) days prior to the date the same would become delinquent.

12.     Section 8 of the Lease provides for ACT to pay for insurance on the leased property, and specifically states that "Tenant shall pay or cause to be paid all premiums for the insurance coverage (a) required to be maintained by Tenant hereunder; and (b) carried by Landlord as provided in Section 13. Subject to Section 9, Tenant shall reimburse Landlord for its insurance premiums within thirty (30) days of demand."

13.     Section 9 of the Lease permits FHP to create an "Impound Account" for purposes of insurance and tax payments due under the Lease.  FHP has not exercised this option.

14.     Section 17 of the Lease provides for "Events of Default."  Section 17(a) states that such an Event of Default will occur if ACT "will fail to pay Landlord any Rent or additional rent within thirty (30) days after Landlord notifies Tenant in writing that it is unpaid; provided that Landlord shall not be obligate [sic] to provide such notice and cure right more than two (2) times in any period of twelve (12) consecutive months and the third such failure shall be an Event of Default without further notice or cure right."

15.     For purposes of this Lease, the term "additional rent" refers to any monetary obligations under the Lease other than rent.

16.     Section 17(b) further provides that a failure to "perform or comply with any of the conditions of this Lease within thirty (30) days after written notice" creates an Event of Default, however if the nature of the obligation "is such that more than thirty (30) days are required for its performance, then the Tenant will not be deemed to be in default if it commences such performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion not later than ninety (90) days after Tenant receives the non-breaching party's written notice."

17.     Section 17(e) further provides that an Event of Default will occur if "Tenant or any Guarantor shall be liquidated or dissolved, or shall begin proceedings toward such liquidation or dissolution, or shall, in any manner, permit the sale or divestiture of substantially all its assets (except to the extent such a sale is expressly permitted

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 4

hereunder)."

18.     Section 18 of the Lease provides for remedies in the case of an Event of Default.  Specifically, it states that upon "the occurrence of an Event of Default, Landlord shall have the option to do and perform any one or more of the following in addition to, and not in limitation of, any other remedy or right permitted it by law or in equity or by this Lease."

19.     One remedy, available under Section 18(b), is that FHP "with or without terminating this Lease, may immediately or any time thereafter demand in writing that Tenant vacate the Leased Property and thereupon Tenant shall vacate the Leased property and remove therefrom all property thereon belonging to or placed on the Leased Property by . . . Tenant within ten (10) business days of receipt by Tenant of such notice from Landlord, whereupon Landlord shall have the right to re-enter and take possession of the Leased Property."

20.     Another remedy, available under Section 18(c), is re-entry and removal, where FHP "with or without terminating this Lease, may immediately or at any time thereafter, re-enter the Leased Property and remove therefrom Tenant and all property belonging to or placed on the Leased Property by . . . Tenant."

### B.  The Settlement Agreement

21.     In February 2023, FHP commenced an eviction action against ACT.  FHP sought eviction based on an alleged Event of Default under Section 17(e) of the Lease.

22.     In that action, FHP obtained a Final Judgment of Eviction that ACT then appealed.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 5

23.    While this appeal was pending, on June 25, 2023, the parties resolved the case and entered into a Settlement Agreement that amended the Lease in part.

24.    Section 3 of the Settlement Agreement provided for the establishment of a $2,500,000 Evergreen Reserve Account payable to FHP to be held in trust.  Section 3(c) of the Settlement Agreement provides that FHP "will be entitled to draw from the Evergreen Reserve Account rents, additional rents, operating expense or any other amounts that may become overdue and owing for any length of time under the Texas Lease (a 'Monetary Default')."

25.    Section 3(c) further provides that ACT "must replenish any payment of overdue amounts from the Evergreen Reserve Account within fourteen (14) days of notice to Addiction Campuses of such payment.  Failure to replenish a payment made from the Evergreen Reserve Account constitutes an Event of Default under the Texas Lease without the right to notice or cure."

26.    Section 3(c) also states that the "purpose of this term is to guarantee timely payments under the Texas Lease and eliminate the need for Landlord to file a lawsuit to collect overdue amounts."

27.    Section 3(d) provides that the Evergreen Reserve Account "shall be an interest-bearing account with the interest credited to Addiction Campuses."

28.    There is no language in the Settlement Agreement that obligates FHP to utilize the Evergreen Reserve Account — it is available for use at FHP's discretion.

29.    Section 6(a) of the Settlement Agreement amends the Lease and provides that "to the extent FHP seeks payment or repayment of operating expense, real estate taxes

or insurance expense, FHP agrees any such demand will be made to Addiction Campuses at least thirty (30) days in advance of the due date."

30.    Section 6(c) of the Settlement Agreement further amends the Lease and provides that "any non-monetary failure to perform or comply with the conditions of the Texas Lease caused in whole or in part by Guarantor shall be deemed an obligation for which more than thirty (30) days are required for Tenant's performance, and shall be entitled to a ninety (90) day cure period from the date of FHP's written notice of a failure to perform or comply with the conditions of the lease."

31.    Section 6(d) of the Settlement Agreement states that "FHP releases and agrees not to pursue Events of Default under the Texas Lease alleged to have occurred before the execution of this Agreement and will provide new notice for any alleged future Events of Default if required under the Texas Lease."

### C.  Disputed Payments

32.    On January 1, 2024, ACT owed FHP $209,161.45 for January rent.

33.    ACT made a partial payment towards January rent and requested that FHP withdraw the balance of January rent from the Evergreen Reserve Account's accrued interest.

34.    FHP did then withdraw accrued interest from the Evergreen Reserve Account sufficient to satisfy the balance of ACT's January rent obligation.

35.    On February 1, 2024, ACT owed FHP $209,161.45 for February rent.  That same day, ACT's counsel requested that FHP withdraw February rent from the Evergreen Reserve Account.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 7

36.    On February 2, 2024, FHP notified ACT of nonpayment of February rent. This notice was the first such notice in 2024.

37.    On February 9, 2024, FHP's counsel emailed ACT's counsel, stating that FHP declined to withdraw funds from the Evergreen Reserve Account for February rent.

38.    On February 29, 2024, ACT delivered a check to FHP's office with the full amount of February rent.

39.    On February 14, 2024, FHP demanded payment for various expenses from ACT. These expenses included insurance premiums, management and administrative fees, and legal and accounting expenses. On February 26, 2024, FHP updated the invoice to include mortgage consulting fees.

40.    ACT paid the insurance premiums in April 2024 but disputed its obligation to pay the remaining expenses. ACT ultimately paid the remaining expenses on January 3, 2025.

41.    On March 1, 2024, ACT delivered a check to FHP's office with the full amount of March rent.

42.    On April 16, 2024, FHP received a notice from its mortgage lender that the 2023 real estate taxes on the property covered by the Lease were delinquent. FHP paid the overdue taxes on April 18, 2024.

43.    On May 22, 2024, FHP demanded payment from ACT for the 2023 taxes. ACT repaid FHP for the 2023 taxes that same day.

44.    On April 3, 2024, ACT paid April rent two days after the April 1 due date.

45.    On June 3, 2024, ACT paid June rent two days after the June 1 due date.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 8

### D. The Guaranty Agreement and Guarantor's Financial Status

46.     On April 1, 2017, FHP entered into a Lease Guaranty with Freedom Healthcare of America, LLC ("FHA").

47.     The Lease Guaranty states, in a recital paragraph, that it applies to "a lease with Addiction Campuses of Texas, LLC . . . with respect to certain premises, consisting of real property and the buildings located thereon at 6950 Shady Lane, Scurry, TX 75158 (the "Lease"), such Lease being of even date herewith."

48.     The only lease between ACT and FHP regarding the property at 6950 Shady Lane, Scurry, TX 75158 that was executed on April 1, 2017, is the Lease at issue in this case.

49.     As of December 31, 2021, FHA held over $75 million in assets.  At that time, it leased four inpatient addiction treatment facilities and nineteen outpatient clinics.  At that time, FHA was the owner and operator of ACT.

50.     On December 29, 2022, FHA sold its interests in three of its four inpatient facilities, including ACT.  This sale resulted in a sale of between eighty and ninety percent of FHA's revenue-generating assets.

51.     As of December 31, 2022, FHA reported holding over $66 million in assets.

52.     FHP's concerns over this sale of FHA's assets resulted in it bringing a separate eviction suit that terminated in the Settlement Agreement.

53.     On November 9, 2023, FHA sold its interest in its final remaining inpatient facility.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 9

54.     As of December 31, 2023, FHA reported holding over $46 million in assets. At that time, it leased eighteen outpatient addiction treatment clinics and no inpatient facilities.

### III. CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the parties and the subject matter of this case.

2.     FHP is barred from pursuing Events of Default alleged to have occurred before June 25, 2023, because it waived any such claims in the Settlement Agreement.

3.     Under Texas law, a plaintiff is entitled to immediate possession in a forcible detainer action when it shows (1) it owns the property, (2) the tenant is either a tenant at will, tenant at sufferance, or is willfully holding over after the termination of its right of possession; (3) the plaintiff gave proper notice to the tenant to vacate; and (4) the tenant refused to vacate. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 478 (Tex. 2017).

4.     FHP owns the property that is the Subject of the Lease and Guaranty Agreement in this case.

5.     FHP served a three-day Notice to Vacate on ACT on March 4, 2024.

6.     ACT refused to vacate upon receiving such notice.

7.     However, FHP failed to show it is entitled to the writ of possession it seeks because it failed to prove any Event of Default under the Lease that would terminate ACT's right of possession.  First, FHP failed to prove a monetary default, as it does not establish that sufficient notice was given under Section 17(a)'s notice-and-cure provision.  Second, FHP failed to prove a guarantor default, because it does not show that FHA divested itself of "substantially all its assets."

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 10

8.      Under Texas law, the "most important consideration in interpreting a lease is the agreement's plain, grammatical language." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). "A court's task 'is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.'" *Id.* (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018)). In doing so, a court should read the entire lease together and attempt to harmonize all its parts, even if they appear contradictory or inconsistent. *Id.*

### A. FHP Failed to Carry Its Burden of Proof to Show a Monetary Default

9.      FHP fails to meet its burden of proof to establish that any monetary default occurred pursuant to Section 17(a) of the Lease. FHP asserts that February rent, expenses demanded on February 14, property taxes, April rent, and June rent were late and establish at least one Event of Default. However, because FHP failed to give sufficient notice, as required under Section 17(a)'s notice-and-cure provision, FHP fails to prove any Event of Default under this section.

10.     FHP's February 2, 2024, notice of nonpayment of February rent triggered ACT's first thirty-day cure period within a 12-month period.

11.     FHP was not obligated to draw funds from the Evergreen Reserve Account to cover February rent as ACT requested.

12.     Before February 2024, ACT typically made rent payments via wire transfer. However, no language in the Lease requires ACT to pay rent via wire transfer. The Lease is silent on method of payment, only requiring that payment be made "at Landlord's offices or such other address as Landlord may notify Tenant in writing." Accordingly, ACT is

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 11

permitted under the lease to pay rent via check. Thus, ACT's payment of February rent by check on February 29, 2024, satisfied its cure obligation. While it took twelve days for the bank to release the funds to FHP from this check, the moment of "payment occurs when 'money passes from the debtor to the creditor for the purpose of extinguishing the debt and the creditor receives it for the same purpose." *Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 678 (5th Cir. 2023) (quoting *Rowlett v. Superior Ins. Co.*, 325 S.W.2d 921, 923 (Tex. App. — Eastland 1959, writ ref'd n.r.e.)). Here, the check passed from ACT to FHP for the purpose of paying February rent on February 29, and FHP received it that same day. Accordingly, ACT's payment of February rent by check on February 29 did not result in an Event of Default.

13.    FHP's letter on February 14, 2024, did not operate as a notice sufficient to trigger ACT's second thirty-day cure period under Section 17 of the lease. Rather, it was the initial demand for payment of the listed insurance and other expenses. Under Section 6(a) of the Settlement Agreement, any demand for "payment or repayment of operating expense, real estate taxes or insurance expense" must be made by FHP "at least thirty (30) days in advance of the due date." This demand period must, as a matter of construction, be separate from Section 17(a)'s notice-and-cure provision. That provision obligates FHP to provide notice that rent or additional rent is "unpaid" and then give ACT thirty days to cure. Under the Settlement Agreement, any payment for insurance, real estate taxes, or operating expense is not "unpaid" — i.e., past the due date — until thirty-one days after FHP made a demand for such payment. A construction where the thirty-day demand period is collapsed into the Section 17(a) notice period would create the absurd result where, after

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 12

the second notice period in twelve months, ACT would immediately be in default once FHP demands an insurance payment. Therefore, these two provisions operate independently, and FHP was accordingly obligated to provide ACT with a notice of nonpayment *after* thirty days had passed from February 14, 2024, which it did not do.

14.    Under Texas law, "substantial compliance" is the applicable standard for evaluating a party's adherence to a contractual notice provision. *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 405–06 (Tex. 2022). This means that "a party's minor deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain." *Id.* at 406. Here, however, FHP did not attempt any form of required notice after its initial demand for insurance and other expense payments. This total failure to issue a written notice, as required by the lease, does not meet the substantial compliance standard.

15.    Because FHP did not provide the required Section 17 notice for the expenses in the February 14, 2024, letter, ACT's more-than-thirty-days-later payment of the insurance and other expenses did not create an Event of Default under Section 17 of the Lease.

16.    ACT failed to timely pay real estate taxes for 2023 directly to the taxing authority as required under Section 7 of the Lease, but this did not result in an Event of Default. Section 17(a) provides than an Event of Default occurs if ACT "will fail to pay *Landlord* any Rent or additional rent" under the thirty-day notice and cure framework.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 13

Thus, failure to pay the *taxing authority* cannot create an Event of Default under this provision.

17.    Section 17(b) provides for an Event of Default if ACT "will fail to perform or comply with any of the conditions of this Lease within thirty (30) days after written notice by the Landlord." On its face, this provision could provide for an Event of Default based on nonpayment of taxes directly to the taxing authority, as it is a condition of the Lease. However, to become an Event of Default, a breach under this provision requires a thirty-day notice period. And this Section 17(b) notice period is not subject to the only-twice-per-twelve-months limitation on Section 17(a) notice periods. And similarly, under Section 6(a) of the Settlement Agreement, FHP was obligated to give ACT thirty days to make a payment or repayment of real estate taxes after FHP made a demand.

18.    FHP's May 22, 2024, demand for repayment of the 2023 taxes triggered a 30-day window for ACT to make the requested payment.

19.    ACT's repayment of those taxes to FHP on the same day, May 22, 2024, satisfied its obligation and did not result in an Event of Default under the Lease.

20.    ACT's two-day-late payments of April rent and June rent did not result in Events of Default because it was still entitled to its second notice-and-cure opportunity under Section 17(a) at the time of those payments. FHP gave no such notice, and therefore no Event of Default occurred resulting from these payments.

21.    FHP does not meet its burden of proof to show that any sufficient notice under Section 17(a) of the Lease was provided for any other allegedly past-due payment in 2024.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 14

22.    Therefore, FHP failed to prove that any Event of Default arose under Sections 17(a) or 17(b) for any monetary obligation of the Lease.

**B.  FHP Failed to Carry Its Burden of Proof to Show a Guarantor Default**

23.    Based on the language of the Lease Guaranty's recital describing the property, and the fact that the only lease regarding this property between the parties is the April 2017 Lease that is the subject of this case, the Court concludes that the Lease Guaranty applies to the Lease.

24.    Under Texas law, the "test to be applied when ascertaining whether all or substantially all assets are about to be sold is not the amount or value of the assets disposed of, but rather the nature of the transaction, that is, is the sale in furtherance of the express object of the corporation."  *ART Midwest, Inc. v. Clapper*, 2009 WL 10646744, at \*17 (N.D. Tex. 2009) (quoting *Governing Bd. v. Pannill*, 561 S.W.2d 517, 525 (Tex. App. — Texarkana 1977, writ ref'd n.r.e.)), *aff'd sub nom. Art Midwest Inc. v. Atl. Ltd. P'ship XIII*, 742 F.3d 206 (5th Cir. 2014); *see also Cyrix Corp. v. Intel Corp.*, 803 F. Supp. 1200, 1211 (E.D. Tex. 1992) (noting, under Delaware law, that sale of substantially all assets occurs when "the sale is of assets quantitatively vital to the operation of the corporation . . . and substantially affects the existence and purpose of the corporation"); *Rudisill v. Arnold White & Durkee, P.C.*, 148 S.W.3d 556, 560 (Tex. App. — Houston [14th Dist.] 2004, no pet.) (equating the disposition of "all or substantially all assets" under the Texas Business Corporations Act with the liquidation and cessation of business after the disposition).  In *Cyrix*, the court explained that it "must focus on the nature of the corporation and the effect

of the transaction on its ability to carry out its purpose after the time of the transaction." 803 F. Supp. at 1211.

25.    Similarly, in the context of Internal Revenue Code provisions distinguishing between certain corporate liquidations and reorganizations, the test for whether all or substantially all of an organization's assets have been disposed of is whether the organization has retained or sold the assets necessary to operate an ongoing business.  *See Smothers v. United States*, 642 F.2d 894, 897–900 (5th Cir. Unit A Apr. 1981) ("Courts therefore have invariably . . . focused on the operating assets of the business[,] the tangible assets actively used in the business when making the 'substantially all assets' assessment.") (citing 26 U.S.C. § 354(b)(1)(A)).

26.    Under the Lease, a guarantor breach is a continuing breach, not a discrete event.  The purpose of this provision in the Lease is to ensure the financial wherewithal of the guarantor.  This purpose is frustrated by a divestiture of substantially all the guarantor's assets both at the time of the divestiture and on a continuing basis. Thus, despite FHP's waiver of its right to pursue claims based on Events of Default predating the Settlement Agreement, a guarantor's status as having divested itself of substantially all its assets creates a continuing breach, and therefore future Events of Default, for which FHP can pursue relief.

27.    Here, FHP failed to prove that FHA divested itself of "substantially all its assets" based on either FHA's December 29, 2022, sale of three inpatient facilities or its November 9, 2023, sale of the remaining inpatient facility.  Even considering both sales together, FHP has not shown that FHA can no longer operate or engage in its purpose of

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 16

providing addiction treatment services. After these sales, the evidence shows that FHA still operates eighteen outpatient addiction treatment centers. FHA did seem to pivot away from offering both inpatient and outpatient services. But moving to an outpatient-only structure is not the same as a cessation of business, a liquidation, or an inability to operate as an ongoing business.

28.     While FHP did establish that the sale of the inpatient facilities resulted in an approximately 80% reduction in revenue for FHA, there is no evidence describing how the sale impacted the expense side of the business from which the Court could conclude that the sales would render FHA insolvent. Instead, the evidence shows FHA operates multiple outpatient facilities and still retains more than 60% of the total financial assets it had before the sales. Accordingly, the Court concludes FHP failed to show that FHA divested itself of substantially all its assets.

29.     Further, FHP failed to prove that it provided the required 90-day notice and cure period for a guarantor default under Section 17(e) of the lease. As elaborated in Section 6(c) of the Settlement Agreement and Section 17(b) of the Lease, a nonmonetary default caused by Guarantor is an obligation for which ACT is entitled to a written notice of default and a ninety-day cure period. The only evidence that FHP points to as a written notice of a guarantor default after the Settlement Agreement is its March 4, 2024, Notice to Vacate. However, the contents of this Notice to Vacate are not in the record. And there is no testimony supporting the idea that this Notice to Vacate included any reference to guarantor default sufficient to put ACT on notice that a guarantor default provision was in play.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 17

30.     FHP attempts to bolster the evidence about the Notice to Vacate by submitting an affidavit of Randall Bruce as an attachment to its response to ACT's post-trial motion for judgment.  Despite submitting this affidavit after the close of evidence, FHP asks the Court to take judicial notice of it because it was filed on the docket in a different case.  However, the Court declines to do so.  "Rule 201 of the Federal Rules of Evidence provides that a court *may* take judicial notice of an 'adjudicative fact' if the fact is 'not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned.'" *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998) (quoting FED. R. EVID. 201(b)).  However, when "a court takes judicial notice of public documents or documents from another court, it may only take notice of the undisputed facts therein, which do not include the 'facts' asserted in various affidavits and depositions."  *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 664–65 (N.D. Tex. 2011).  Here, the facts asserted in the affidavit of Bruce are neither generally known nor reasonably indisputable.  Accordingly, the Court will not take judicial notice of the FHP's proffered affidavit.

31.     Accordingly, because FHP has failed to prove FHA divested itself of substantially all its assets and because it failed to prove it provided the required written notice of guarantor default under the Lease, the Court concludes FHP has failed to prove any Event of Default based on the Guarantor's financial status.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 18

CONCLUSION

Any findings of fact that are more properly considered to be conclusions of law, or any conclusion of law that are more properly considered to be findings of fact, are also adopted by the Court as such.

Based on the evidence adduced at trial, the Court concludes that FHP has failed to meet its burden of proof on its sole claim for forcible detainer. FHP failed to prove any Event of Default that would terminate ACT's right of possession. It failed to show any monetary default because the evidence shows FHP did not provide ACT with the required notice-and-cure opportunity under Section 17(a) of the Lease. And it failed to show any guarantor default because the evidence shows FHA did not divest itself of substantially all its assets and because there is no evidence FHP provided ACT with the required notice-and-cure opportunity under Section 17(b) of the Lease. Accordingly, the Court concludes that FHP should take nothing on its forcible detainer claim.

Signed April 21, 2025.


David C. Godbey
Chief United States District Judge


FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 19